### Austin E. Jaquith vs. Jonathan Hudson.

Where a contract in duplicate was left, by the parties, with a third person, and the evidence as to the arrangement for its subsequent delivery, and the terms upon which it was to become operative, was conflicting; — *Held*, That the question of the terms and conditions upon which the contract was to become operative, was one of fact for the jury, depending upon the intention of the parties, to be gathered from the whole transaction; and that the Court was right in refusing to charge that delivery in a particular mode was essential.

Where A. and B. entered into an agreement, in and by which it was provided "that the said A. agrees to sell, and by these presents does sell and convey, unto the said B., his heirs and assigns, all his right, title, and interest in the stock of goods now owned by the firm of A. and B., together with all the notes, &c."; and that the copartnership that has existed between A. and B. is hereby dissolved; and that the

JAQUITH vs. HUDSON.

said A., by these presents, agrees that he will not engage in the mercantile business in T., for himself, or for or in connection with any other one, for the space of three years from this date, upon the forfeiture of the sum of one thousand dollars, to be collected by the said B. as his damages";—*Held,* That this forfeiture relates only to the agreement not to engage in business, and that the sum mentioned is stipulated and ascertained damages, to be recovered on a breach of that agreement, and is not a penalty.

The law, following the dictates of equity and natural justice, adopts, *as the law of the contract,* the principle of just compensation for the loss or injury actually sustained; and courts will not permit parties, by express stipulations, or any form of language, however clear the intent, to set it aside. But they will apply this principle, and disregard the express stipulations of parties, *only* in those cases where it is obvious from the contract before them, and the whole subject-matter, that the principle of compensation has been disregarded, and that to carry out the express stipulations of the parties would violate this principle.

The real question in *this class* of cases is, not what the parties *intended,* but whether the sum is, *in fact,* in the *nature of a penalty;* and this is to be determined by the magnitude of the sum, in connection with the subject-matter, and not by the words, or the understanding of the parties.

But where, from the nature of the contract, and the subject-matter of the stipulation for the breach of which the sum is provided, it is apparent to the Court that the actual damages for a breach are uncertain in their nature, difficult to be ascertained, or impossible to be estimated with certainty; and where the parties themselves are more intimately acquainted with all the peculiar circumstances, and therefore better able to compute the actual or probable damages than courts or juries from any evidence which can be brought before them,—in such cases the law permits the parties to ascertain for themselves, and provide in the contract, the amount of damages which shall be paid on a breach, and adopts their computation, or estimate, as the best and most certain mode of ascertaining the actual damage, or what sum will amount to a just compensation.

In *all these cases,* where the law permits the parties to ascertain and fix the amount of damages in the contract, the intention of the parties is the governing consideration; and, in ascertaining that intention, no merely technical effect will be given to the particular words relating to the sum, but the entire contract, the subject-matter, and often the situation of the parties with respect to each other and to the subject-matter, will be considered.

The reason for *allowing* the parties to fix in their contract the amount of damages in the latter class of cases, is the same which *denies* that right in the former class; namely, the law adopts the most *practicable mode* of ascertaining the actual damage or *just compensation.*

*Heard May 11th and 12th. Decided May 26th.*

Error to Wayne Circuit Court.

The action was by Jaquith against Hudson, upon a.promissory note for one thousand dollars, given by the latter to the former April 15th, 1855, and payable twelve months after date. Defendant pleaded the general issue, and gave notice that, on the trial, he would prove that, previous to said 15th day of April, 1855, plaintiff and defendant had been and were partners in trade, at Trenton, in said county of

Wayne, under the name of Hudson & Jaquith; that, on that day, the copartnership was dissolved, and the parties then entered into an agreement, of which the following is a copy:

" *This Article of Agreement*, made and entered into between Austin E. Jaquith, of Trenton, Wayne county, and State of Michigan, of the first part, and Jonathan Hudson, of Trenton, county of Wayne, and State of Michigan, of the second part, *Witnesseth*, That the said Austin E. Jaquith agrees to sell, and by these presents does sell and convey, unto the said Jonathan Hudson, his heirs and assigns, all his right, title, and interest in the stock of goods now owned by the firm of Hudson & Jaquith, together with all the notes, books, book-accounts, moneys, deposits, debts, dues, and demands, as well as all assets that in anywise belong to the said firm of Hudson & Jaquith; and that the copartnership that has existed between the said firm of Hudson & Jaquith is hereby dissolved; and that the said Austin E. Jaquith, by these presents, agrees that he will not engage in the mercantile business, in Trenton, for himself, or in connection with any other one, for the space of three years from this date, upon the forfeiture of the sum of one thousand dollars, to be collected by the said Hudson as his damages. *In Consideration Whereof*, the said Jonathan Hudson, of the second part, agrees, for himself, his heirs, and administrators, to pay unto the said Austin E. Jaquith the sum of nine hundred dollars, for his services in the firm of Hudson & Jaquith, together with all the money that he (the said Austin E. Jaquith) paid into said firm, deducting therefrom the amount which he (the said Austin E. Jaquith) has drawn from said firm; the remainder the said Hudson agrees to pay to the said Jaquith, his heirs or assigns, at a time and in a manner as shall be specified in a note bearing even date with these presents. And the said Hudson, for himself, his heirs and assigns, agrees to pay all the debts, notes, and liabilities of the firm of Hudson & Jaquith, and to execute unto the said Jaquith a good and sufficient bond

of indemnification against all claims, debts, or liabilities of the firm of Hudson & Jaquith.

"Trenton, April, 1855. "AUSTIN E. JAQUITH. [L. S.]
        "JONATHAN HUDSON. [L. S.]

"Witness: ARTHUR EDWARDS. ARTHUR EDWARDS, JR."

And defendant further gave notice, among other things, that he would show, on the trial, that, after the execution of said agreement in writing, and the giving of said note in pursuance thereof, and on or about the 15th day of July, 1855, plaintiff, in violation of said agreement, entered into the mercantile business at Trenton, and had continued to carry on the same ever since; by means whereof the consideration of said note had failed. And he further gave notice, that he (the defendant) continued to carry on the mercantile business at Trenton, after the dissolution of said copartnership; and by means of the breach of said articles by plaintiff, defendant had sustained damages to the sum of one thousand dollars, liquidated by said articles for a breach thereof, which sum he would claim to have deducted from the amount of said note, on the trial.

On the trial, the plaintiff having introduced the note in evidence, rested his case.

Defendant then proved by Arthur Edwards the due execution of said agreement. The defendant also proved, by the said witness, that the plaintiff resumed mercantile business in July, 1855, in the village of Trenton, within eighty rods of the old stand of Hudson & Jaquith, and had ever since continued in such business.

On cross-examination, Capt. Edwards testified that the above agreement was made in duplicate, and signed by the parties about the middle of April, 1855, which duplicates were placed in his hands, to be kept till the bond of indemnity and note mentioned in the agreement were executed; that the duplicates were not to be delivered till both parties came and demanded them. Hudson at once took exclusive possession of the store, goods, books, and papers of the old

firm of Hudson & Jaquith, where the duplicate agreements were signed, and they were left in witness' hands until the other papers mentioned in them were executed. Witness did not recollect whether it was said by the parties that the agreement was not to take effect till both parties came for the duplicates. Witness never delivered to the defendant the agreement now produced by him, and can not tell how it came into his possession. The plaintiff and defendant never came and jointly demanded the duplicates of him; he has no recollection that either of the parties ever notified him not to deliver over the papers.

On re-examination, witness said he lived at Trenton in 1855, and his papers were for the most part kept there. Witness can not remember delivering this duplicate to defendant; it might have been delivered by him to defendant, but witness has no recollection of it.

The defendant then, by another witness, gave evidence tending to show that, not long after the date of said agreement, the bond of indemnity mentioned in the agreement was executed by defendant and delivered to the plaintiff.

No evidence was given to show any damage sustained by the defendant, by reason of plaintiff's again engaging in business in Trenton.

The plaintiff then called as a witness Arthur Edwards, Jr., who testified that he was one of the subscribing witnesses to said agreement. The duplicate agreements were to go into Capt. Edwards's hands, and to be delivered only when plaintiff and defendant came together for and demanded them. When they were ready for signing, plaintiff hesitated about signing the duplicates, but witness thinks that Capt. Edwards then said that plaintiff could sign them safely, as he (the said Capt. Edwards) would hold them until they were jointly demanded; can not remember whether Hudson or Edwards made the remark, but one of them made some remark which gave witness the impression that these duplicate papers were to be null until they should be both sim-

ultaneously delivered to the parties. Witness was in and out of the room, and did not hear the whole conversation, and can not say positively whether Hudson was there when this remark was made. There was something said about some other papers, but witness could not recollect it distinctly.

The Court was then asked by plaintiff's counsel to charge the jury, as follows:

" 1. That a delivery to both parties, at the same time, of the agreement in duplicate, by Capt. Arthur Edwards, was essential to give it effect, and render it operative between the said plaintiff and defendant; and before the defendant can claim the full benefit of it, he must show either such `a delivery as was agreed upon, or a willful refusal, on the part of the plaintiff, that such delivery should be made.

" 2. That even if the agreement set up was, in the opinion of the jury, properly delivered, as between the parties, the defendant can not recoup any damages against the plaintiff, except upon evidence showing that some damage was actually sustained by him; that the clause in the agreement as to damages, can not, of itself, and in the absence of evidence, operate to the reduction of the claim of the plaintiff, as the sum fixed in the agreement is in the nature of a penalty, and not liquidated damages; 'and no damages can be recovered under it except such as are proven."

The Court refused so to charge; and plaintiff excepted.

The Court then charged the jury in substance as follows:

" That if the jury were satisfied that the duplicate agreements were placed in Capt. Edwards's hands under the agreement between the parties that the same were not to become operative until both parties called on him to deliver them, that then they must be satisfied that such a delivery had taken place, or the agreement had never taken effect. But if, on the other hand, they should be satisfied that the real nature of the transaction was, that the said duplicate agreements were to be placed in Capt. Edwards's hands solely to

JAQUITH *vs.* HUDSON.

await the future execution and delivery of the bond, note, &c., mentioned in the agreement, and were thereupon to become operative, that then no formal delivery of said duplicates was necessary — the agreement in such case would take effect as soon as the bond, note, &c., mentioned, were made and delivered to plaintiff.

The Court further charged the jury, that it was not necessary for the defendant to prove any actual damage under the plaintiff's breach of the said agreement, as the damages therein fixed were liquidated damages, and not a penalty.

The issue was then submitted to the jury on the evidence, who found a verdict for the plaintiff, in the sum of eighteen dollars and eight cents, allowing the defendant the sum of one thousand dollars mentioned in the agreement.

Plaintiff brought the case to this Court, by writ of error, accompanied by bill of exceptions.

*D. Bethune Duffield*, for plaintiff in error:

1. The evidence showed delivery of the contract to have been made a pre-requisite to its efficacy, and it was not the contract of the plaintiff until such delivery had been made as was provided for.— 2 *Brock.* 64, 74; 2 *Greenl. on Ev.* § 297, *and Note.*

The true construction of the agreement is that when defendant paid plaintiff the $900, and the balance of his interest in the concern, and the debts of the firm, and executed the bond of indemnity, then the agreement was to have been delivered, and plaintiff would have been bound by his covenant not to enter into business.

No precise words are necessary to constitute a condition. It must always depend upon the intention of the parties, to be collected from the terms of the agreement itself, and the subject-matter to which it relates.—2 *Man. & Gr.* 260; 10 *East,* 295; 2 *Doug. Mich.* 16; 2 *Pars. on Cont.* 36, 40, 187, *and Notes*; 10 *Wend.* 310; 5 *Mass.* 67, *and Note*; 21 *Wend.* 267.

2. The $1000 mentioned in the agreement was a *penalty*, and not liquidated damages. This "forfeiture" was evidently intended to secure Hudson against any default on the part of Jaquith, in his agreement, first, to sell his interest in the stock of goods; second, in the books, book-accounts, &c.; third, to dissolve the partnership; and, fourth, not to engage in business. If this be so, we must look at the rules which have been wrought out on this much controverted topic.

The first rule is, That the action of the Court shall not be defined and determined by the terms which the parties have seen fit to apply to the sum fixed upon.—2 *Pars. on Cont.* 434; *Story on Cont.* 1125; 1 *Moody & M.* 41; 9 *Paige*, 101.

The second rule is, That the principle on which courts allow damages, is that of *compensation*, and not the particular form of words agreed upon in the obligation.—2 *Pars. on Cont.* 436, *and Note* f.

The sum "will be treated as a penalty, if, from a consideration of the whole contract, it appears that the parties *intended it as such*"; and this, though they called it liquidated damages, and recoverable in any court of law by the party. —2 *Pars. on Cont.* 435; *Sedgw. on Damages*, 433, 435; 6 *B. & C.* 216, 224; 6 *Bing.* 141; 2 *Bos. & P.* 346; 7 *Scott*, 364; 2 *B. & Ald.* 706; 5 *Lamb*, 247; 3 *C. & P.* 240; 5 *Bing. N. C.* 390; 7 *Scott*, 364; 6 *Ves.* 815; 8 *M. & W.* 846, 853; 9 *Ibid.* 678; see *Note to* 2 *Pars. on Cont. p.* 439, *and authorities there cited.* And see the following American cases: 5 *Sandf.* 192; 7 *Wheat.* 13; 22 *Wend.* 163; *Ibid.* 211; 4 *Ibid.* 468; 18 *Johns.* 219, 226; 13 *Wend.* 587; 1 *Denio* 464; 5 *Sandf.* 640; 9 *Paige* 101; 5 *Metc.* 61, 67; 7 *Metc.* 583, 588; 23 *Pick.* 455, 462; 11 *Mass.* 76, 81; 15 *Mass.* 488; 8 *Miss.* 467; 11 *Miss.* 271; 1 *Ind.* 434; 3 *How. Miss.* 398; 1 *N. J.* 463; 7 *Pa. S. R.* 470; 4 *Pick.* 178.

*G. V. N. Lothrop,* for defendant in error:

1. The first error assigned is untenable, because it asked the Court to usurp the province of the jury. Whether a delivery assented to by both parties was necessary to give the agreement effect, depended upon what facts the jury should find upon the testimony.

2. It is now well settled, that if the parties to an agree-. ment have fairly and intentionally fixed a sum, which is to be taken as the *damages* upon a given breach, it shall control, and no other damages can be given. And whether the sum stipulated to be paid is intended as a penalty, or as liquidated damages, is to be arrived at by the intent of the parties, as ascertained by a just interpretation of the contract.— 2 *Greenl. Ev.* §§ 257, 259; *Sedgw. on Damages,* 448, 449.

In this case, there is but one act, to wit, engaging in business in Trenton within three years, for which damages are stipulated.

The following are cases relative to damages liquidated in contracts not to pursue trades or professions within certain limits: 1 *Holt's N. P.* 43; 3 *C. & P.* 240; 1 *Bing.* 302; 14 *M. & W.* 187; 13 *M. & W.* 695; 7 *M. G. & S.* 716; 1 *W. H. & G.* 659; 8 *Mass.* 223; 7 *Cow.* 307; 4 *Wend.* 468; 17 *Wend.* 447; *S. C.* 22 *Wend.* 201; 11 *Barb.* 127.

The following are other instances of liquidated damages, which may throw some light on this case: 4 *Burr.* 2225; 2 *T. R.* 32; 3 *B. & Ald.* 692; 3 *Y. & Jer.* 302; 7 *Johns.* 72; 15 *Johns.* 200; 13 *Wend.* 587; 24 *Wend.* 244: 10 *Barb.* 59; 18 *Barb.* 338; 19 *Barb.* 107; 27 *Eng. L. & Eq.* 61.

The cases of *Kemble vs. Farren,* 6 *Bing,* 141; *Davis vs. Penton,* 6 *B. & C.* 222; and *Nivers vs. Rossman,* 18 *Barb,* 53, may be referred to as containing important rules in distinguishing between a penalty and liquidated damages.

There can be no case mentioned, where an adjustment

of damages, by the parties, is more necessary than the one
at bar.

CHRISTIANCY J.:

The first point upon which the Court below was requested
to charge, and for the refusal of which the first exception
is taken, assumed that, by the arrangement between the
parties, the contract was not to· become operative, or to
have any force or effect, until the duplicates should be deliv-
ered, by Captain Edwards, to both parties, at the same time.

Whether such was the effect of the arrangement, or,
whether the agreements were placed in the hands of Captain
Edwards solely to await the execution and delivery of the
bond and note mentioned in the contract, and thereupon to
become operative, was a question which depended upon the
intention of the parties, to be gathered from the whole trans-
action, their acts and declarations, and, in some measure,
upon the nature and provisions of the contract itself. It was
a question of fact, involved in the issue. The Court had no
right to assume the truth or falsehood of either side of the
question. The evidence bearing upon the point was conflict-
ing. It was as clearly a question of fact for the jury as any
other fact in issue in the cause. To have charged the jury
as requested, would have been an encroachment by the Court
upon the province of the jury. The question was, therefore,
properly submitted to the jury. The charge of the Court in
this particular was in all respects fair and correct, and the
verdict of the jury is conclusive upon this point. The first
exception, therefore, is not well taken.

The second exception raises the single question, Whether
the sum of one thousand dollars, mentioned in the covenant
of Jaquith not to go into business in Trenton, is to be con-
strued as a penalty, or as stipulated damages — the plaintiff
in error insisting it should be construed as the *former*, the
defendant as the *latter*.

We shall not attempt here to analyze all the decided cases

upon the subject, which were read and cited upon the argument, and which, with others, have been examined. It is not to be denied that there is some conflict, and *more* confusion, in the cases: judges have been long and constantly complaining of the confusion and want of harmony in the decisions upon this subject. But, while no one can fail to discover a very great amount of *apparent* conflict, still it will be found, on examination, that most of the cases, however conflicting in appearance, have yet been decided according to the justice and equity of the particular case. And while there are some isolated cases (and they are but few), which seem to rest upon no very intelligible principle, it will be found, we think, that the following general principles may be confidently said to result from, and to reconcile, the great majority of the cases, both in England and in this country:

*First.* The law, following the dictates of equity and natural justice, in cases of this kind, adopts the *principle of just compensation* for the *loss* or *injury actually sustained;* considering it no greater violation of this principle to confine the injured party to the recovery of *less,* than to enable him, by the aid of the court, to extort *more.* It is the application, in a court of law, of that principle long recognized in courts of equity, which, disregarding the penalty of the bond, gives *only* the *damages actually sustained.* This principle may be stated, in other words, to be, That courts of justice will not recognize or enforce a contract, or any stipulation of a contract, clearly unjust and unconscionable; — a principle of common sense and common honesty so obviously in accordance with the dictates of justice and sound policy, as to make it rather matter of surprise that courts of law had not always, and in all cases, adopted it to the same extent as courts of equity. And, happily for the purposes of justice, the tendency of courts of law seems now to be towards the full recognition of the principle, in all cases.

This principle of natural justice, the courts of law, following courts of equity, have, in this class of cases, adopted

as the *law of the contract;* and they will not permit the parties by express stipulation, or any form of language, however clear the intent, to set it aside; on the familiar ground, "*conventus privatorum non potest publico juri derogare.*"

But the Court will apply this principle, and disregard the express stipulation of parties, *only* in those cases where it is obvious from the contract before them, and the whole subject-matter, that the principle of compensation has been disregarded, and that to carry out the express stipulation of the parties, would violate this principle, which alone the Court recognizes as the law of the contract.

The violation, or disregard, of this principle of compensation, may appear to the Court in various ways,—from the contract, the sum mentioned, and the subject-matter. Thus, where a large sum (say one thousand dollars), is made payable solely in consequence of the non-payment of a much smaller sum (say one hundred dollars), at a certain day; or where the contract is for the performance of several stipulations of very different degrees of importance, and one large sum is made payable on the breach of any one of them, even the most trivial, the damages for which can, in no reasonable probability, amount to that sum:—in the first case, the Court must see that the real damage is readily computed, and that the principle of compensation has been overlooked, or purposely disregarded: in the second case, though there may be more difficulty in ascertaining the precise amount of damage, yet, as the contract exacts the same large sum for the breach of a trivial or comparatively unimportant stipulation, as for that of the *most* important, or of *all of them together*, it is equally clear that the parties have wholly departed from the idea of just compensation, and attempted to fix a rule of damages which the law will not recognize or enforce.

We do not mean to say that the principle above stated as deducible from the cases, is to be found generally announced in express terms, in the language of the courts; but it will be found, we think, to be necessarily implied in, and

JAQUITH vs. HUDSON.

to form the only rational foundation for, all that large class of cases which have held the sum to be in the nature of a penalty, notwithstanding the strongest and most explicit declarations of the parties that it was intended as stipulated and ascertained damages.

It is true, the courts in nearly all these cases profess to be construing the contract with reference to the intention of the parties, as if for the purpose of ascertaining and giving effect to that intention; yet it is obvious, from these cases, that wherever it has appeared to the Court, from the face of the contract and the subject-matter, that the sum was clearly too large for just compensation, here, while they will allow any form of words, even those expressing the direct contrary, to indicate the intent to make it a penalty, yet no form of words, no force of language, is competent to the expression of the opposite intent. Here, then, is an intention incapable of expression in words; and as all written contracts must be expressed in words, it would seem to be a mere waste of time and effort to look for such an intention in such a contract. And as the question is between two opposite intents only, and the *negation* of the one necessarily implies the *existence* of the *other*, there would seem to be no room left for construction with reference to the intent. It must, then, be manifest that the intention of the parties in such cases is not the governing consideration.

But some of the cases attempt to justify this mode of construing the contract with reference to the intent, by declaring, in substance, that though the language is the strongest which could be used to evince the intention in favor of stipulated damages, still, if it appear clearly, by reference to the subject-matter, that the parties have made the stipulation without reference to the principle of just compensation, and so excessive as to be out of all proportion to the actual damage, the Court must hold that they could not have intended it as stipulated damages, though they have so expressly declared.—See, as an example of this class of cases, *Kemble vs. Farren,* 6 *Bing.* 141.

Now this, it is true, may lead to the same result in the particular case, as to have placed the decision upon the true ground; viz., that though the parties actually intended the sum to be paid, as the damages agreed upon between them, yet it being clearly unconscionable, the Court would disregard the intention, and refuse to enforce the stipulation. But, as a rule of construction, or interpretation of contracts, it is radically vicious, and tends to a confusion of ideas in the construction of contracts generally. It is this, more than any thing else, which has produced so much apparent conflict in the decisions upon this whole subject of penalty and stipulated damages. It sets at defiance all rules of interpretation, by denying the intention of the parties to be what they, in the most unambiguous terms, have declared it to be, and finds an intention directly opposite to that which is clearly expressed— "*divinatio, non interpretatio est, quœ omnino recedit a litera.*"

Again the attempt to place this question upon the intention of the parties, and to make this the governing consideration, necessarily implies that, if the intention to make the sum stipulated damages should clearly appear, the Court would enforce the contract according to that intention. To test this, let it be asked, Whether, in such a case, if it were *admitted* that the parties actually *intended* the sum to be considered as *stipulated damages*, and *not* as a penalty, would a court of law enforce it for the amount stipulated? Clearly, they could not, without going back to the technical and long exploded doctrine which gave the whole penalty of the bond, without reference to the damages actually sustained. They would thus be simply changing the *names* of things, and enforcing, *under the name of stipulated damages*, what in its *own nature* is but a *penalty*.

The real question in this class of cases will be found to be, not what the parties *intended*, but whether the sum is, *in fact, in the nature* of a penalty; and this is to be determined by the magnitude of the sum, in connection with the subject-matter, and not at all by the words or the understanding

of the parties. The intention of the parties can not alter it. While courts of law gave the penalty of the bond, the parties intended the payment of the penalty as much as they now intend the payment of stipulated damages: it must, therefore, we think, be very obvious that the actual intention of the parties, in this class of cases, and relating to this point, is wholly immaterial; and though the courts have very generally professed to base their decisions upon the intention of the parties, that intention *is not*, and *can not, be made* the *real basis* of *these decisions*. In endeavoring to reconcile their decisions with the actual intention of the parties, the courts have sometimes been compelled to use language wholly at war with any idea of interpretation, and to say "that the parties must be considered as not meaning exactly what they say."—*Homer vs. Flintoff*, 9 *M. & W. per Park. B.* May it not be said, with at least equal propriety, that the courts have sometimes *said* what they *did not exactly mean?*

The foregoing remarks are all to be confined to that class of cases where it was clear, from the sum mentioned and the subject-matter, that the principle of compensation had been disregarded.

But, *Secondly*, there are great numbers of cases, where, from the nature of the contract and the subject-matter of the stipulation, for the breach of which the sum is provided, it is apparent to the Court that the actual damages for a breach are uncertain in their nature, difficult to be ascertained, or impossible to be estimated with certainty, by reference to any pecuniary standard, and where the parties themselves are more intimately acquainted with all the peculiar circumstances, and therefore better able to compute the actual or probable damages, than courts or juries, from any evidence which can be brought before them. In all such cases, the law permits the parties to *ascertain* for themselves, and to provide in the contract itself, the amount of the damages which shall be paid for the breach. In permitting this, the law does not lose sight of the principle of compensation, which is the law of

the contract, but merely adopts the computation or estimate of the damages made by the parties, as being the *best* and *most certain mode* of ascertaining the actual damage, or what sum will amount to a just compensation. The *reason*, therefore, for *allowing* the parties to ascertain for themselves the damages in this class of cases, is the *same* which *denies* the right in the former class of cases; viz., the courts adopt the *best* and *most practicable* mode of *ascertaining* the sum which will produce *just compensation*.

In this class of cases, where the law permits the parties to ascertain and fix the amount of damages in the contract, the first inquiry obviously is, Whether they have done so in fact? And here, the *intention* of the parties is the *governing consideration*; and in ascertaining this intention, no merely technical effect will be given to the particular words relating to the sum, but the entire contract, the subject-matter, and often the situation of the parties with respect to each other and to the subject-matter, will be considered. Thus, though the word "penalty" be used (*Sainter vs. Fergason*, 7 *M. G. & S.* 716; *Jones vs. Green*, 3 *Y. & Jer.* 299; *Pierce vs. Fuller*, 8 *Mass.* 223), or "forfeit" (*Noble vs. Noble et al.* 7 *Cow.* 307), or "forfeit and pay" (*Fletcher vs. Dycke*, 2 *T. R.* 32), it will still be held to be stipulated damages, if, from the whole contract, the subject-matter, and situation of the parties, it can be gathered that such was their intention. And in proportion as the difficulty of ascertaining the actual damage by proof is greater or less, where this difficulty grows out of the nature of such damages, in the like proportion is the presumption more or less strong that the parties intended to fix the amount.

It remains only to apply these principles to the case before us. It is contended by the plaintiff in error, that the payment of the one thousand dollars mentioned in the covenant of Jaquith is not made dependent solely upon the breach of the stipulation not to go into business in Trenton, but that it applies equally—first, to the agreement to sell to Hudson his

interest in the goods; second, to sell his interest in the books, notes, accounts, &c.; and, third, to the agreement to dissolve the partnership. But we can perceive no ground for such a construction. The language in reference to the sale of the interest in the goods, books, notes, accounts, &c., and that in reference to the dissolution, is not that of a sale *in futuro*, nor for the dissolution of the partnership at a future period, but it is that of a *present sale* and a *present dissolution*— "does hereby sell," and "the copartnership is hereby dissolved," is the language of the instrument. It is plain, from this language, from the subject-matter, and from all the acts of the parties, that these provisions were to take, and did take, immediate effect. There could be no possible occasion to provide any penalty *or* stipulated damages for the non-performance of *these* stipulations, because this sale and dissolution would already have been accomplished the moment the contract took effect for any purpose; and, until it took effect, the stipulation for the one thousand dollars could not take effect, or afford any security; nor would Hudson be bound or need the security. But it remained to provide for the future. If Jaquith were to be at liberty to set up a rival store in the same village, it might seriously affect the success of Hudson's business; and we are bound to infer, from the whole scope of this contract, that Hudson would never have agreed to pay the consideration mentioned in it, nor to have entered into the contract at all, but for the stipulation of Jaquith "that he will not engage in the mercantile business in Trenton, for himself or in connection with any other one, for the space of three years from this date, upon the forfeiture of the sum of one thousand dollars, *to be collected by said Hudson as his damages.*" This stipulation of Jaquith not to go into business, is the only one on his part which looks to the future; and it is to this, *alone*, that the language in reference to the one thousand dollars applies. Any other construction would do violence to the language, and be at war with the whole subject-matter.

.The damages to arise from the breach of this covenant, from the nature of the case, must be not only uncertain in their nature, but impossible to be exhibited in proof, with any reasonable degree of accuracy, by any evidence which could possibly be adduced. It is easy to see that while the damages might be very heavy, it would be very difficult clearly to prove any. Their nature and amount could be better estimated by the parties themselves, than by witnesses, courts, or juries. It is, then, precisely one of that class of cases in which it has always been recognized as peculiarly appropriate for the parties to fix and agree upon the damages for themselves. In such a case, the language must be very clear to the contrary, to overcome the inference of intent (so to fix them), to be drawn from the subject-matter and the situation of the parties; because, it is difficult to suppose, in such a case, that the party taking the stipulation intended it only to cover the amount of damages actually to be proved, as he would be entitled to the latter without the *mention* of *any sum* in the contract, and he must also be supposed to know that his actual damages, from the nature of the case, are not susceptible of legal proof to any thing approaching their actual extent. That the parties actually intended, in this case, to fix the amount to be recovered, is clear from the language itself, without the aid of a reference to the subject-matter, — "upon the forfeiture of the sum of one thousand dollars, to *be collected* by the said Hudson *as his damages*." It is manifest from this language that it was intended Hudson should "collect," or, in other words, receive this amount, and that it should be for his *damages* for the breach of the stipulation. This language is stronger than "forfeit and pay," or "under the penalty of," as these might be supposed to have reference to the form of the penal part of a bond, or to the form of action upon it, and not to the actual "collection" of the money.

It is, therefore, very clear, from every view we have been able to take of this case, that it was competent and proper

for the parties to ascertain and fix for themselves the amount of damages for the breach complained of, and equally clear that they have done so in fact. From the uncertain nature of the damages, we can not say that the sum in this case exceeds the actual damages, or that the principle of compensation has been violated. Indeed, it would have been perhaps difficult to discover a violation of this principle had the sum in this case been more than it now is; though, doubtless, even in such cases as the present, if the sum stated were so excessive as clearly to exceed all reasonable apprehension of actual loss or injury for the breach, we should be compelled to disregard the intention of the parties, and treat the sum only as a penalty to cover the actual damages to be exhibited in proof. In this case the party must be held to the amount stipulated in his contract.

The second exception, therefore, is not well taken; the Court properly refused to charge as requested, and no error appearing in the record, the judgment of the Circuit Court for the county of Wayne must be affirmed.

The other Justices concurred.