# STATE OF MICHIGAN

# COURT OF APPEALS

---

OWENS-BROCKWAY GLASS CONTAINERS
INC,

        Plaintiff/Counter-Defendant-
        Appellant,

v

STATE TAX COMMISSION,

        Defendant-Appellee,

and

CITY OF CHARLOTTE,

        Defendant/Counter-Plaintiff-
        Appellee.

UNPUBLISHED
October 21, 2014

No.  314190
Ingham County Circuit Court
LC No.  11-000071-CK

---

Before:  RONAYNE KRAUSE, P.J., and WILDER and STEPHENS, JJ.

PER CURIAM.

Plaintiff appeals as of right the December 14, 2012 judgment in favor of defendant after a bench trial in Ingham County Circuit Court.  The trial court dismissed plaintiff's complaint for a declaratory judgment and awarded $4,015,875 in damages to defendant.  We affirm.

## I.  FACTUAL BACKGROUND

Plaintiff owns a manufacturing plant in Charlotte, Michigan, that produced glass containers for the food industry.  Plaintiff intended to close the plant in the late 1990s as a result of the high cost of operating inefficient equipment, primarily an obsolete furnace that was near the end of its useful life.  Plaintiff entered into an agreement (Agreement) with the city of Charlotte (defendant) in 1999, where plaintiff received a property tax abatement in exchange for upgrading its facilities and keeping at least 130 jobs at the plant.  Plaintiff used the tax abatement to purchase and install a new oxy-fuel furnace, as well as equipment for forming, inspection, load-building, and support.

-1-

The tax abatement was in the form of an Industrial Facilities Tax Certificate (IFT) granted by the State Tax Commission (STC) under the Plant Rehabilitation and Industrial Development District Act, Public Act 198 of 1974 (Act 198). MCL 207.572 requires such IFTs to be in writing. The tax abatement ran from December 30, 1999, to December 30, 2011, and the Agreement stipulated what would happen in the event plaintiff closed the plant prior to December 30, 2011:

4.1     In the event of closing as determined after investigation of the facts and a public hearing, [plaintiff] shall be immediately liable for penalties to be paid forthwith to the City, determined as follows:

4.1.1     [Plaintiff] shall pay to the City for pro rata distribution to the taxing units experiencing the abatement, an amount equal to the difference between the [IFT] which it has paid, and the total property taxes to the relevant taxing units which it would have paid, given its installation of improvements or equipment, during the years for which the [IFT] was in effect.  In essence, [plaintiff] shall be liable to refund, in full, all abated taxes.

In Section 3.2, the Agreement stated that "[c]losing shall mean, for purposes of this agreement, the removal, without the transfer to another site within the City of substantially all of the production facilities, and the elimination of substantially all the jobs created or retained thereby, which are set forth in [plaintiff's] application."  The City's Mayor at the time, David Brown, testified at trial that the purpose of Sections 3.2 and 4.1 was to keep plaintiff in the community.

From December 30, 1999, to April 30, 2010, plaintiff fully complied with the Agreement. During that time, plaintiff earned net profits exceeding $57 million.  However, in May 2010, plaintiff ceased manufacturing operations at the plant and released substantially all of its employees.  Plaintiff proceeded to remove or dismantle equipment, including all four bottle machines and control equipment for the furnace.  Other various pieces of equipment were transferred to other plants.  By January 2011, enough equipment had been dismantled, shipped out, or disposed of that the plant was incapable of producing glass bottles.

On June 28, 2010, defendant submitted a resolution to the STC seeking the revocation of Plaintiff's IFT. The STC held a hearing on December 7, 2010, with representatives present from plaintiff and defendant.  On December 20, 2010, the STC voted to revoke plaintiff's IFT and subsequently sent plaintiff an Order of Revocation on January 10, 2011.  Defendant sent plaintiff a document titled "[Plaintiff] Tax Obligation" that estimated that plaintiff owed defendant $4 million.

Plaintiff filed a separate complaint seeking declaratory judgment against the STC and defendant on January 14, 2011.  The parties refer to this action as "the STC Appeal."  The trial court dismissed the STC Appeal for lack of standing.  At trial, plaintiff claimed that it had not "closed" the plant under the terms of the Agreement, that Section 4.1.1 constituted an unenforceable penalty, and that defendant was attempting to collect an unconstitutional tax.  The trial court determined that the "penalty" in the Agreement was a valid liquidated damages clause. Further, the trial court determined that, under the terms of Section 3.2 of the Agreement, plaintiff had "closed" the plant and owed defendant the abated taxes of $4,015,875.  The trial court

-2-

dismissed plaintiff's complaint for a declaratory judgment and awarded $4,015,875 in damages to defendant. This appeal follows from that order.

## II. PLANT CLOSING

On appeal, plaintiff argues that the trial court erred in determining that the definition of a plant "closing" under Section 3.2 was ambiguous and that a closing had actually occurred. In response, defendant argues that the doctrine of res judicata precludes consideration of appeal of the closing issue. Applying the doctrine is a question of law that this Court reviews de novo. *Pierson Sand & Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 379; 596 NW2d 153 (1999). On the other hand, the arguments made by plaintiff concerning the issue of closing are questions of fact. This Court reviews a trial court's finding of fact in a bench trial for clear error. *Alan Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003).

In response to defendant's claim of res judicata, plaintiff argues that the doctrine has no place in this appeal because the question of whether a "closing" under Section 3.2 of the Agreement occurred was never adjudicated in any case other than the contract case on appeal here. Plaintiff contends that defendant offers nothing to show that the existence of a "closing" was decided on the merits in the STC Appeal or was ever an issue in that case at all. In fact, plaintiff's argument makes clear the fact that in the STC Appeal, all the trial court did was adopt its ruling of a "closing" from the contract case. This Court agrees with plaintiff's argument in its entirety, noting that defendant admits in its own brief that this would be a highly unusual application of the doctrine.

The elements of res judicata are as follows: (1) the prior action was decided on the merits; (2) the prior decision resulted in a final judgment; (3) both actions involved the same parties or those in privity with the parties; and (4) the issues presented in the subsequent case were or could have been decided in the prior case. *Stoudemire v Stoudemire*, 248 Mich App 325, 334; 639 NW2d 274 (2001). The burden of proving this doctrine's applicability rests with defendant. *Baraga Cty v State Tax Comm*, 466 Mich 264, 269; 645 NW2d 13 (2002).

Defendant falls well short of its burden. The STC Appeal was dismissed simply as a matter of standing. A plain reading of the order shows unambiguously that there was no decision based on the merits. Instead, there is simply a reference to another case, which happens to be the instant appeal. Because res judicata is not applicable, the remaining arguments made by plaintiff must be addressed.

Plaintiff argues that the trial court used extrinsic evidence to impose new meaning on "closing" without ever finding any ambiguity, adding a gloss upon the terms "removal" and "substantially all" by injecting concepts of functionality and value not found in the four corners of the Agreement. Plaintiff contends that the trial court's only duty was to determine what terms defendant actually wrote in Section 3.2, and then enforce those terms according to their defined or common meaning(s). Instead, plaintiff argues, the trial court disregarded Section 3.2 as written, redefining "removal" to include not only the IFT property transferred outside the city, but also the IFT property on-site that had "no value." Had the trial court applied the plain meaning of Section 3.2 as written, plaintiff argues that it would have found in its favor as a matter of law. This Court agrees with plaintiff that the terms of the Agreement are unambiguous,

but disagrees with the conclusion reached by plaintiff. The trial court clearly determined whether the plant had closed using the common meaning of these terms. That the plant was no longer capable of converting raw materials into the end product is not a superfluous requirement, as argued by plaintiff; instead, it is a factual determination made by the trial court in order to rule that the plant had closed.

When contractual terms are unambiguous, the only place a court can look to discern the parties' intent is the four corners of the contract. *Zurich Ins Co v CCR & Co (On Rehearing)*, 226 Mich App 599, 605-606; 576 NW2d 392 (1997). In the absence of ambiguity, "contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins Co v Kneeland*, 464 Mich 491, 496; 628 NW2d 491 (2001). Although the trial court did consider defendant's extrinsic evidence, it did not do so for the purpose of discerning the meaning that the parties intended to give to the definition of "closing" in the Agreement. Rather, the trial court considered the extrinsic evidence offered by defendant in order to make a factual determination of whether the Agreement had been breached. Because the trial court was not discerning the parties' intent when it considered defendant's extrinsic evidence, plaintiff's argument regarding ambiguity is erroneous.

Defendant had the burden of proving a plant "closing" under Section 3.2. Plaintiff asserts that defendant did not carry this burden as it failed to prove the "removal" of "substantially all" of the IFT property from the plant.[1] According to plaintiff, the commonly used meaning of "removal" is the act or process of removing, and the root word "remove" means "to change the location . . . of something." Because the context of Section 3.2 sets the term's only qualification, "removal" in this context plainly means changing the physical location of the IFT property to a place outside the city. Similarly, plaintiff argues that "substantially all" should be defined as the term is commonly used in the dictionary because it does not have a special meaning in Section 3.2 and it is not a legal term of art. The dictionary defines the root word "substantial" as considerable in quantity. Therefore, given its context in Section 3.2, plaintiff asserts that the common usage of "substantially all" requires a comparison between the "removed" IFT property and all the IFT property subject to the IFT Certificate. Plaintiff then contends that the Agreement provides only one quantifiable measuring device: the original $33 million investment of IFT property, which Section 1.2 lists by item description and investment amount for easy comparison and calculation.

After the plant ceased operations in April 2010, four different analyses quantified the percentage of the original cost of the production facilities that were still physically located in the

---

[1] While defendant defined "closing" in Section 3.2, it did not specifically define "removal" or "substantially all." The Michigan Supreme Court directs lower courts to "interpret [each] such term in accordance with its commonly used meaning," which can be determined by consulting a dictionary. *Stanton v City of Battle Creek*, 466 Mich 611, 617; 647 NW2d 508 (2002). Accordingly, plaintiff's definitions of "removal" and "substantially all," including their variations and root words, are derived from Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc 1984), as well as from defendant's brief in opposition to second motion.

plant. While the separate analyses may vary somewhat, plaintiff points to the fact that they all report between 70% and 85% of the value of the original IFT property had not been removed from the plant by the end of the Agreement's intended term on December 30, 2011. According to plaintiff, that means that only 15% to 30% of the original IFT property could have been removed, which neither defendant nor the trial court could sincerely describe as being "substantially all" of the production facilities under Section 3.2.

However, that argument is fatally flawed. Plaintiff argues that the Agreement should be construed according to the common meaning of its terms, yet proceeds to analyze the IFT property in terms of value. In other words, plaintiff argues that "substantially all" should be based on quantity rather than on value or functionality, then immediately argues that "quantity" is a function of "value." This argument is simply not logical. Plaintiff asserts that the value (i.e. cost) of the IFT property in Section 1.2 is the only quantifiable measurement in the Agreement; however, the list by item description (i.e. unit by unit) in Section 1.2 is an equally viable quantifiable measuring device. Defendant offered direct and indirect evidence supporting that substantially all of the production facilities had been removed from the facility. As direct evidence, defendant's expert testified that the plant was in a state of salvage and that substantially all of the capital equipment had been removed. As indirect evidence, defendant offered an amended pleading by plaintiff asserting that the true cash value of the remaining IFT property in tax year 2011 was $250,000. Not only is this inconsistent with plaintiff's claim that there was between 70% and 85% of the property remaining on-site (the initial value of which was in excess of $33 million), but it is also an admission that substantially all of the equipment was no longer at the plant.

This Court will only upend the trial court's findings of fact if it is left with a definite and firm conviction that a mistake has been committed. *Rigoni v Mich Power Co*, 131 Mich App 336, 341; 345 NW2d 918 (1984). "A reviewing court must treat the trial court's findings with substantial deference in light of its superior ability to assess the credibility of evidence." *Habersack v Rabaut*, 93 Mich App 300, 304; 287 NW2d 213 (1979). The credibility of witnesses is a question for the trier of fact and, in a bench trial, special regard is given to the findings of the trial court as it relates to credibility. *Sweetman v State Highway Dept*, 137 Mich App 14, 20; 357 NW2d 783 (1984). While plaintiff can plead inconsistent theories, it can only allege two or more inconsistent statements of fact when in doubt about which one is true. MCR 2.111(A)(2)(a). Allegations of fact are admissible as admissions against interest. *Grand Trunk Western R Co v Lovejoy*, 304 Mich 35, 41; 7 NW2d 212 (1942).

A fair reading of this record plainly demonstrates that the findings of the trial court regarding a closing as that term is defined in Section 3.2 are well supported by the evidence. In fact, plaintiff's argument is unsuccessful regardless of how "substantially all" is interpreted. Quantitatively, almost all of the enumerable items of IFT equipment had been removed from the plant by the time of closing. Valuably, plaintiff bases its argument on the original value of the furnace rather than its present value at the time of closing (which, according to testimony, was very minimal). And functionally, the entire operation was at the end of its lifespan and almost all of the plant's functional IFT equipment had been removed or exhausted by the time of closing. Consequently, plaintiff's argument fails no matter how the Agreement is construed, even if it is presumed that someone else's dictionary offers a different definition of "substantially

all." Based on this record, this Court is not left with a definite and firm conviction that a mistake has been made.

Finally, in its reply brief, plaintiff asserts that its construction of the Agreement neither produces an absurd result nor breaches other covenants contained within the Agreement. Plaintiff argues that there was no breach of contract because the furnace had not been physically removed from the plant. However, defendant's expert testified that it would be unheard of to relocate a furnace such as this because any attempted removal essentially destroys it. Under plaintiff's interpretation of the Agreement, there could never be a circumstance in which the removal of any property other than the furnace would ever constitute "substantially all" of the production facilities because the furnace represented $17 million out of the original $33 million. We agree with defendant that such a construction would mean there could never be a closing and, in this circumstance, would render Section 3.2 meaningless.

Plaintiff argues that enforcing the plain meaning of "closing" under Section 3.2 of the Agreement does not conflict with other covenants contained in the Agreement, particularly Sections 1.6 and 1.8. These sections specify that, during the entire term, plaintiff must maintain production and utilization of the improvements in equipment at the plant, as well as maintain the equipment and improvements in accordance with practices standard in the industry so as to minimize physical and functional obsolescence. Plaintiff asserts that defendant could have easily correlated these three sections when it drafted the Agreement and that defendant's failure to do so does not entitle it to invent any such relationship now. However, plaintiff cannot maintain production and utilization of the improvements and equipment and simultaneously transfer all of the useful property to other plants and abandon the unwanted property. Operating the furnace to the very end of its useful life, then proceeding to shut it down and wait on its demolition is not maintaining the improvements so as to minimize the physical and functional obsolescence. Further, it is worth noting that plaintiff correlated Sections 3.2 and 1.2 in its attempt to quantify the IFT property, yet now argues that defendant cannot correlate Sections 3.2, 1.6, and 1.8 without having specifically written such a relationship into the Agreement.

Contracts are to be construed as a whole, and all of its parts are to be harmonized so far as reasonably possible. *Genesee Food Services*, *Inc v Meadowbrook*, *Inc*, 279 Mich App 649, 656; 760 NW2d 259 (2008). Therefore, the trial court properly found that the plant had closed within the meaning of Section 3.2, which means that it did not commit clear error.

III. LIQUIDATED DAMAGES CLAUSE

Next, plaintiff argues the damages provision in the Agreement violates the principle of just compensation because the damages were ascertainable when the Agreement was signed and the provision damages were disproportionate to the actual harm to defendant. Additionally, plaintiff argues that the liquidated damages clause in the Agreement runs counter to public policy.

The meaning and legal effect of a contractual clause are reviewed de novo. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). Contrary to most inquiries regarding contract law, the intent of the parties is not considered when addressing a damages clause. *Moore v St. Clair County*, 120 Mich App 335, 339; 328 NW2d 47 (1982); See also

*Wilkinson v Lanterman*, 314 Mich 568, 574; 22 NW2d 827 (1946); *Jaquith v Hudson*, 5 Mich 123, 136 (1858). When the term "penalty" is used in a contract, it does not necessarily imply a penalty. *Moore*, 120 Mich App at 340. "The validity of a liquidated damages clause depends on the conditions existing when the contract was signed rather than at the time of the breach." *Barclae v Zarb*, 300 Mich App 455, 485; 834 NW2d 100 (2013). Whether damages are ascertainable is not necessarily dispositive of a liquidated damages clause being enforceable; damages being difficult to ascertain only makes a liquidated damages clause more appropriate. See *St Clair Med*, *PC v Borgiel*, 270 Mich App 260, 271; 715 NW2d 914 (2006). The determinative issue is just compensation. *Jaquith*, 5 Mich at 132-133. In determining whether a liquidated damages clause provides just compensation, courts look to whether "the amount is reasonable with relation to the possible injury suffered and not unconscionable or excessive." *St Clair Med*, 270 Mich App at 271. Whether or not the damages are reasonable can be determined by evaluating the magnitude of the sum compared to the subject matter of the agreement. *Watson v Harrison*, 324 Mich 16, 20; 36 NW2d 295 (1949).

The facts of this case are similar to *St Clair Med*, 270 Mich App 260, where the court held "the amount of damages is reasonable in relation to the possible injury suffered. Plaintiff stated that the clause was included in the contract because damages associated with a physician's departure are difficult to calculate." *Id.* at 271. Here, the damages associated with plaintiff's departure would be similarly difficult to calculate. Defendant *attempted* to estimate the abated taxes in an Economic Impact Analysis from 1999, but the attempt does not necessarily mean that the damages were easily ascertainable. The impact of a breach by plaintiff on defendant and other taxing units would depend on whether the employees who lost their jobs were residents of the city, as well as on how those employees spent their money within the city. Further, the individuals holding those jobs over the course of the abatement could have changed, making the investigation into the impact on defendant and other taxing units even more complicated. In other words, the ripple effect of plaintiff's breach made the possible injury to defendant very difficult to calculate.

We note that a reader unfamiliar with the subject matter may question the fact that the running of the damages is retroactive, rather than running from the time of the breach until the end of the contractual period. However, the very fact of closing the facility means that plaintiff would no longer be paying the same taxes or receiving the abatement; therefore, there would be no abated taxes during that period to repay. Thus, at the time of the Agreement, recouping the abated taxes in the event plaintiff breached would have been a reasonable way to compensate defendant for its damages.

Prior to signing the Agreement, plaintiff planned to close the plant and would have realized no profit from it during the same ten-year period. When compared to plaintiff's $56 million net profit created by the Agreement, returning the $4 million abatement does not strike us as unreasonable or excessive. Finally, while not binding because it had not been enacted at the time of the Agreement, this Court finds persuasive that the Legislature now *requires* a provision in all Act 198 agreements that a business may be forced to repay some or all abated taxes if they violate the contract. MCL 207.572(2)(b).

Lastly, plaintiff argues that because the liquidated damages increase the longer a business stays in the city, an agreement requiring the repayment of abated taxes violates public policy by

creating a perverse incentive for businesses to leave as early as possible. We disagree. Plaintiff's argument fails to consider the benefits received by the business during the period of the agreements. The longer a well-run business stays within the city, the more profit it can realize due to the tax abatement. Agreements such as the one at issue here actually *encourage* businesses to stay in communities to maximize profits, and do not run counter to public policy. Accordingly, under Michigan law, the liquidated damages clause in the Agreement is enforceable.

Plaintiff also asserts that defendant set out to collect an unconstitutional tax. However, the liquidated damages set forth in the Agreement do not carry the essential features of a tax and do not pass the test laid out by our Supreme Court. Three factors are to be considered when determining whether a payment is a tax. First, if it is a tax, its purpose is to raise revenue. *Bolt*, 459 Mich at 161. Second, when distinguishing between a user fee and a tax, a user fee must be proportionate to the service. *Id.* at 161-162. Third, a tax is not voluntary. *Id.* at 162.

Here, the purpose of the provision was to create an incentive for plaintiff to complete performance of the Agreement. As such, the liquidated damages clause is not designed to raise revenue and fails the first *Bolt* factor. The second *Bolt* factor is inapplicable because plaintiff received no service as part of the Agreement. The liquidated damages clause in the Agreement also fails the third *Bolt* factor. Plaintiff had a choice in whether to pay the stipulated damages. Had it not signed the Agreement, it could have avoided the abatement scenario in its entirety. Or, had it kept the plant open after signing the Agreement, it would not have incurred the damages claimed by defendant. Thus, the payment of the damages is voluntary. Because the purpose was not to raise revenue and payment was voluntary, the liquidated damages clause was not a tax.

## IV. CONTRACT DISPUTE

The STC argues that it does not have a duty to review private agreements required by statute to obtain an IFT. It also argues that it is not the duty of the STC to enforce provisions of those agreements. This Court "review[s] a trial court's findings of fact in a bench trial for clear error and conduct[s] a review de novo of the court's conclusions of law." *City of Flint v Chrisdom Properties*, *Ltd*, 283 Mich App 494, 498; 770 NW2d 888 (2009), quoting *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001).

When applying for an IFT under Act 198, MCL 207.572 requires that the parties file a written agreement with the Department of Treasury. Without such an agreement, the STC cannot issue an IFT. In terms of revoking an IFT, following a hearing, "[t]he commission shall by order revoke the certificate if the commission finds that . . . the holder of the certificate has not proceeded in good faith with the replacement, restoration, or construction and operation of the facility or with the use of the speculative building as a manufacturing facility in good faith in a manner consistent with the purposes of this act." MCL 207.565(3).

There is no language in MCL 207.527 requiring the STC to review the agreements. In fact, the STC's only duty is to review the application to ensure it includes an agreement, rather than to review the agreement for specific terms. MCL 207.527. When revoking an IFT, the STC does not look to whether a party has breached the private agreement. Instead, it has its own

criteria. MCL 207.565(3). Therefore, the instant appeal does not involve questions related to the STC.[2] We concur with the trial court's ruling that the STC should not be a party to this action.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Kurtis T. Wilder
/s/ Cynthia Diane Stephens

---

[2] In fact, the STC Appeal involves the question of whether the STC's revocation of plaintiff's IFT was appropriate.