JEWETT, BIGELOW & BROOKS v. DETROIT EDISON CO. *

(Circuit Court of Appeals, Sixth Circuit.    June 17, 1921.)

No. 3473.

1. **Damages** ⊂⇒78(6)—**Provision in sale contract for liquidated damages for breach valid and enforceable.**

In a contract for the sale and purchase of coal, to be shipped during a year, provisions that the seller should pay 20 cents per ton for each ton short in shipping as liquidated damages, and that the purchaser should pay 20 cents per ton for such tonnage as it should not accept as liquidated damages, *held* valid, under the rule of the federal courts and also under the law of Michigan, and to measure the amount recoverable by the purchaser, which prepared and submitted the written contract, for a shortage in shipments by the seller.

2. **Sales** ⊂⇒88—**Whether coal was "mined," within meaning of contract, question for jury.**

Defendant, which was a seller of coal in large quantities, but not a mine owner or operator, contracted to furnish with 30,000 tons of "2" nut and slack coal" from certain named mines, to be delivered within one year, the contract providing that, "if less than the scheduled tons of coal is mined from these mines during any month or months, and all the coal so mined is shipped to" plaintiff, no damages should be charged to defendant. "2" nut and slack coal," as known in the trade, was a grade obtained by screening run of mine coal. Sufficient run of mine coal was taken from the mines named to produce the quantity of "2" nut and slack," if it had been screened; but, owing to the fact that the mine owners, over whom defendant had no control, did not screen a large part of it because of a scarcity of cars, sufficient "2" nut and slack" was not produced to fill the contract. In an action for failure to deliver the quantity required, the question whether sufficient coal of the kind called for was "mined," within the meaning of the contract, was one for the jury.

3. **Accord and satisfaction** ⊂⇒26(2)—**Evidence tending to establish such defense held admissible.**

Where defendant was short in delivery of coal to plaintiff under a contract, and for that avowed reason offered to secure for plaintiff a contract with other mines for a large quantity of coal at less than the market price, which offer was accepted and the contract made, evidence of such transaction was admissible, in an action for breach of the first contract, as tending to prove an accord and satisfaction, or at least as a defense pro tanto.

4. **Customs and usages** ⊂⇒17—**Custom cannot be shown to alter express terms of contract.**

A trade custom, though known to both parties, cannot be shown to alter or vary the express terms of a written contract.

Appeal from the District Court of the United States for the Southern Division of the Eastern District of Michigan.

Action at law by the Detroit Edison Company against Jewett, Bigelow & Brooks. Judgment for plaintiff and defendants bring error. Reversed.

On the 1st day of July, 1916, Jewett, Bigelow & Brooks entered into a contract with the Detroit Edison Company, the important parts of which contract are as follows:

"Witnesseth, that the coal company sells and the Edison Company buys twenty thousand (20,000) tons of 6" mine run coal from the Harlan mines, located at Harlan, on the Louisville & Nashville Railroad, Kentucky. The

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 256 U. S. ——, 42 Sup. Ct. 52, 65 L. Ed. ——.

coal company agrees and guarantees to ship between the 1st day of July, 1916, and the 20th day of June, 1917, the coal herein mentioned in accordance with the following schedule: * * *

"(1) If during any month or months covered by this contract period, there shall have been mined the amount scheduled, or more tons of coal at the mines mentioned herein, and less than the scheduled tons shall have been shipped to the Edison Company during this period, then the Edison Company shall have the right to charge the coal company as its liquidated damages twenty (20) cents per ton for each ton short in shipping, and the Edison Company may deduct such damages from any moneys due to the coal company.

"(2) If, however, less than the scheduled tons of coal is mined from these mines during any month or months, and all of the coal so mined is shipped to the Edison Company, then no damages shall be charged to the coal company; but it shall be obligatory on the part of the coal company to furnish evidence satisfactory to the Edison Company that less than a total of the scheduled tons of coal was mined, and that all of the coal which was mined was shipped to the Edison Company.

"(3) The Edison Company agrees to accept the full tonnage covered by this agreement, provided same is shipped within the contract period and under the conditions stipulated in the contract or pay liquidated damages in the sum of twenty (20) cents per ton to the coal company for such tonnage as it shall not accept.

"It is also understood and agreed that nothing in this agreement is to relieve the Coal Company from its obligation to ship the Edison Company all or part of the tonnage scheduled for each month provided sufficient coal is mined."

The contract further provided that the Edison Company would pay to the coal company, for this coal, $1 per ton, f. o. b. mines. On the same day the coal company made a proposition in writing that it would sell to the Edison Company during any month or months within the period of this agreement an additional tonnage of coal from the mine or mines referred to in the agreement, up to 10 per cent. of coal scheduled for that month or months, at the same price and under the same condition as covered by the agreement, provided the Edison Company would notify it 30 days in advance that it would require such additional tonnage.

On the same day another contract, separate and distinct from the first contract herein referred to, was entered into between the same parties, by the terms of which the coal company agreed to sell, and the Edison Company agreed to buy, 30,000 tons of 2″ nut and slack coal from the Harvey and Varilla mines, located at Hazard, on the Louisville & Nashville Railroad, Kentucky, at an agreed price of 85 cents per ton, f. o. b. mines, to be delivered within one year from that date in monthly installments specified therein. All the other provisions of this contract are identical with the provisions in the first contract for run of mine coal.

Accompanying this contract there was also a written proposition by the coal company, agreeing to increase this tonnage 10 per cent. upon the same terms and conditions named in the proposition accompanying the first contract. It does not appear that the Edison Company ever gave any orders for additional coal, in accordance with the terms of these two separate propositions; but it does appear that on July 3, 1916, it ordered 1,000 additional tons run of mine coal for July, which order was accepted by the coal company. It further appears that in August another additional 1,000 tons of mine run coal was ordered and accepted, and in the same month an order was placed for 10,000 additional tons to be delivered at the rate of 1,000 tons per month, commencing in September of that year, and continuing for the remaining 10 months covered by that contract. This made a total tonnage of 32,000 tons run of mine to be delivered under the terms and conditions named in the first contract and these three supplemental contracts, and 30,000 tons of 2″ nut and slack on the second contract.

The Harlan mines include a large number of mines in Harlan county, Ky., which mines produced a much larger quantity of 6" run of mine coal than the amount named in the first contract, including the 12,000 additional tons. The Harvey and Varilla mines consist of but two mines located near Hazard, Ky. The output of these mines would have been sufficient to produce 30,000 tons of 2" nut and slack had the same been screened; but very little of this coal was screened by the owners and operators of these mines because of the shortage of cars. Jewett, Bigelow & Brooks were not the owners of these mines, and had no control over their operation; they were simply coal brokers who bought from the mine operator and sold to the retailer or consumer.

It appears from the evidence that the plaintiff delivered upon the first contract an excess of the monthly requirements, except for the months of October and November, 1916, and May, 1917. However, it further appears that by agreement between the parties the excess tonnage of run of mine coal shipped during any of these months should be credited upon the nut and slack contract, so that, notwithstanding the coal company shipped substantially the full amount of the run of mine tonnage from the Harlan mines covered by this contract and the supplemental contracts during the year, nevertheless it was short in the scheduled tonnage for these three months.

Upon the second contract for nut and slack the defendant shipped in July, 1917, 139 tons, and in August 445 tons, a total of 584 tons, and no more. The Edison Company brought action against the coal company to recover damages in the sum of $100,000 sustained by it by reason of the breach of these contracts by defendant. This was later increased to $125,000. The declaration averred the making and execution of these two separate contracts, one for 20,000 tons run of mine coal from the Harlan mines, the other for 30,000 tons 2" nut and slack from the Harvey and Varilla mines, and also the three separate contracts covering the additional 12,000 tons of run of mine coal from the Harlan mines, but stated the default as a joint default on both contracts to the full amount of the coal not shipped by the defendant, after first deducting from the tonnage actually delivered the 12,000 tons covered by the supplemental contracts. The defendant, however, made no objection to the averment of one default in gross upon these separate contracts, but pleaded the general issue, and gave notice of several special pleas or defenses, the more important of which will be discussed in the opinion.

Upon the issue so joined the jury returned a verdict for the plaintiff in the sum of $86,850.19, upon which verdict judgment was rendered by the trial court. The plaintiff in error seeks to reverse this judgment upon 7 separate grounds of alleged error; the more important of which will be considered in detail in the opinion in this case.

Hal H. Smith, of Detroit, Mich. (Beaumont, Smith & Harris, of Detroit, Mich., on the brief), for plaintiff in error.

James O. Murfin and James V. Oxtoby, both of Detroit, Mich. (Oxtoby & Wilkinson, of Detroit, Mich., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). [1] It is insisted by the plaintiff in error that this judgment should be reversed for error of the court in holding that the provisions of the contracts relating to stipulated damages gave the Edison Company a right to elect to accept such damages, or to recover its actual damages. The provision of the contract in that respect is not subject to such construction. The term "liquidated damages" means a definite sum or amount, which has been determined by agreement of the parties or by litigation. At the time this contract was written, these damages had not

been ascertained by litigation. Therefore the provision in this contract that "the Edison Company shall have the right to charge the coal company as its liquidated damages 20 cents per ton for each ton short in shipping" necessarily means that the parties had determined, or believed they had determined, by agreement between themselves, the precise amount of damages the Edison Company would sustain by reason of any failure on the part of the coal company to keep its contract and deliver the amount of coal named therein. Otherwise the term "liquidated damages" would have no place or meaning in this contract.

The further provision of that paragraph, that "the Edison Company may deduct such damages from any moneys due to the coal company," can in no way change or alter the terms of the contract in reference to liquidated damages. The intention and purpose of the parties to ascertain and determine by agreement a sum certain as liquidated damages for a breach of the conditions of this contract by either party further appears by the provisions of paragraph 3 of the conditions written therein, in which paragraph it is provided that, upon the failure of the Edison Company to accept the full tonnage, it would pay to the coal company liquidated damages in the sum of 20 cents per ton for such tonnage as it fails to accept. Under this provision of the contract, if it is not invalid for other reasons, the coal company would be bound to accept 20 cents a ton in full of its damages. There is nothing in this contract to indicate that these two provisions as to liquidated damages in case of default by either were not correlative, and equally binding on each of the parties thereto.

In the construction of this contract it must also be remembered that these contracts were on printed forms or order contracts used by the Edison Company in the conduct of its business, and must therefore be construed more strongly against the contracting party, that prepared and used these printed forms for this purpose. Texas & Pacific Ry. Co. v. Reiss, 183 U. S. 626, 22 Sup. Ct. 253, 46 L. Ed. 358; Bank v. Employers' Liability Ins. Co. (C. C. A.) 270 Fed. 567. However, recourse to this rule of construction is hardly necessary in this case. The language of the contract in this respect is sufficiently clear to indicate the intent and purpose of the parties to fix by agreement, binding on both parties, a fixed and definite amount as liquidated damages in case of default by either of the contracting parties. It is not to be presumed that the Edison Company, studiously and adroitly, so framed this contract that any part of its terms and provisions should be optional as to it, but binding on the coal company. In any event, it must be held to the terms of the contract as written, and, construing this contract as a whole, the conclusion follows that the provision as to 20 cents a ton as liquidated damages necessarily means that such liquidated damages have been determined by agreement between the parties, which agreement, if valid, is mutually binding upon both parties to this contract.

Upon the question as to the validity of this provision for liquidated damages, it is insisted on the part of the defendant in error that these

are Michigan contracts, and must be construed in the light of the decisions of the Supreme Court of that state; that under these decisions, in the state of Michigan, liquidated damages may be agreed upon only when the actual damages are not capable of being readily ascertained. The decisions of the Supreme Court of Michigan were fully discussed and considered by this court in the case of Board of Commerce of Ann Arbor v. Security Trust Co., 225 Fed. 454, at page 461 et seq., 140 C. C. A. 486. From the opinion in that case, it appears that this court reached the conclusion that the Supreme Court of Michigan had not limited the validity of contracts for liquidated damages to cases only, in which the loss cannot be measured by a pecuniary standard, but that, even in cases where such damages are capable of being readily ascertained, the court will disregard the express stipulation of the parties only where it is obvious, from the contract before it and the whole subject-matter of the contract, that the principle of compensation has been disregarded. The conclusion reached by this court in that case is fully sustained by the leading Michigan cases on this subject.

In the case of Jaquith v. Hudson, 5 Mich. 123, Christiancy, J., discussed at great length contracts of this character applying to cases where actual damages might be readily ascertained, and in conclusion, at pages 136, 137, said:

"The foregoing remarks are all to be confined to that class of cases where it is clear, from the sum mentioned and the subject-matter, that the principle of compensation has been disregarded."

Then he proceeds to discuss a second class of cases, in which actual damages are not easily ascertainable, and concludes with this statement:

"In all such cases, the law permits the parties to ascertain for themselves, and to provide in the contract itself, the amount of the damages which shall be paid for the breach"

—but further says that, even in this class of cases, the law does not lose sight of the principle of compensation, but merely accepts the estimate of damages fixed by the parties as the best and most practicable mode of ascertaining the sum which will produce just compensation. The contract before the court in that case was such a contract, so that what the learned judge said in reference to provisions in other contracts for liquidated damages, where the damages are easily ascertainable, is wholly obiter; nevertheless in subsequent Michigan cases the Supreme Court of that state has discussed the opinion of Judge Christiancy at great length, especially in the case of Calbeck v. Ford, 140 Mich. 56, 103 N. W. 516, and Ross v. Loescher, 152 Mich. 386, 116 N. W. 193, 25 Am. St. Rep. 418, in each of which cases the contract under consideration was one within the second class named by Judge Christiancy.

It is, however, expressly stated in the opinion in Jaquith v. Hudson, supra, that—

"The court will apply this principle, and disregard the express stipulation of parties, only in those cases where it is obvious from the contract before them, and the whole subject-matter that the principle of compensation has been disregarded."

Discussing this question further, the court said:

"The violation or disregard of this principle of compensation may appear to the court in various ways—from the contract, the sum mentioned, and the subject-matter. Thus, where a large sum (say $1,000), is made payable solely in consequence of the nonpayment of a much smaller sum (say $100) at a certain day, or where the contract is for the performance of several stipulations of very different degrees of importance, and one large sum is made payable on the breach of any one of them, even the most trivial, the damages for which can, in no reasonable probability, amount to that sum,  *  *  * yet as the contract exacts the same large sum for the breach of a trivial or comparatively unimportant stipulation as for that of the most important, or of all of them together, it is equally clear that the parties have wholly departed from the idea of just compensation, and attempted to fix a rule of damages which the law will not recognize or enforce."

These illustrations, as to the various ways in which a violation or disregard of the principle of compensation may appear to the court, are very well exemplified in the case of Davis v. Freeman, 10 Mich. 191, where one party agreed to draw for another a quantity of timber at $1.50 per thousand, $1 per thousand of which was to be paid defendant, and the remainder to be "settled, fixed, and liquidated damages" in case the contract was not completed. It was held that the sum so fixed was to be regarded as a penalty, since otherwise the nearer the contract was completed, the greater the damages to be recovered, while if the party should fail to draw any of the timber there could be no recovery. The court in the opinion in that case said:

"If the contract had provided for the payment of 50 cents per thousand feet as liquidated damages for timber not drawn, the case would be altogether different."

Christiancy, J., in a concurring opinion, said:

"It is very clear that 50 cents per thousand feet was never estimated by the parties as the actual or probable damages to result from a breach, and that in fixing upon this sum they had no reference to the idea of compensation."

In the contract now under consideration the provision as to stipulated damages is not a fixed sum in gross, regardless of the extent of the breach; but, on the contrary, it is a specific amount for each ton that defendant failed to deliver, so that if the breach is trifling the damages will be trifling. In this respect it does not contain the objectionable feature in the contract under consideration by the Supreme Court of Michigan in Davis v. Freeman, supra, but, on the contrary, is just such a contract as meets the suggestion in the opinion of Manning, J., that—

"If the contract had provided for a payment of 50 cents per thousand feet as liquidated damages for the timber not drawn, the case would be altogether different."

It would therefore appear that the Michigan rule as to contracts for liquidated damages is not substantially different from the modern federal rule, further than that the Michigan Supreme Court has declared that, where damages are not difficult of ascertainment, the court is inclined to treat the stipulated damages as a penalty and inquire into actual damages. Noble v. Sturm, 210 Mich. 462, 178 N. W. 99. Notwithstanding this statement as to the attitude of the court toward con-

tracts of this character, it fully appears from all of the decisions of that court that such contracts will be upheld in cases where damages may be readily ascertained, provided only it appears from the contract itself, the subject-matter of the contract, and the amount named therein, that the question of compensation has not been disregarded, but that the parties have in good faith intended and attempted to fix a sum certain as reasonable compensation for breach, and not penalty.

The later Michigan cases are all based upon Jaquith v. Hudson, supra, announced May 26, 1858, which opinion was at that time consistent with the decision of other courts upon the same question. The Supreme Court in the case of Wise, Trustee, v. U. S., 249 U. S. 361–365, 39 Sup. Ct. 303, 63 L. Ed. 647, calls attention to the fact that that court in the case of Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, applied in U. S. v. Bethlehem Steel Co., 205 U. S. 105, 27 Sup. Ct. 450, 51 L. Ed. 731, stated:

"The result of the modern decisions was determined to be that in such cases courts will endeavor, by a construction of the agreement which the parties have made, to ascertain what their intention was when they inserted such a stipulation for payment, of a designated sum or upon a designated basis, for a breach of a covenant of their contract, precisely as they seek for the intention of the parties in other respects. When that intention is clearly ascertainable from the writing, effect will be given to the provision, as freely as to any other, where the damages are uncertain in nature or amount or are difficult of ascertainment or where the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at, or as to imply fraud, mistake, circumvention, or oppression. There is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, when fairly and understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced."

The court then calls attention to the fact that the cases in which courts had refused to enforce contracts for liquidated damages were decided at a time when courts were disposed to look upon such provisions in contracts with disfavor, and to construe them strictly, if not astutely, in order that damages, even though termed liquidated, might be treated as penalties, so that only such loss as could be definitely proved could be recovered. Following this statement, the court says:

"The later rule, however, is to look with candor if not with favor upon such provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights as promoting prompt performance of contracts."

This is not substantially different from the statement of Judge Christiancy in Jaquith v. Hudson, supra, that contracts for liquidated damages will not be sustained "where it is clear from the sum mentioned and the subject-matter that the principle of compensation has been disregarded." Even if the Michigan rule were different from the federal rule, the decision of a state court of last resort is not controlling upon the federal courts on questions of general jurisprudence. Insurance Co. v. Moore, 231 U. S. 543, 34 Sup. Ct. 186, 58 L. Ed. 356.

Mr. Brennan, the purchasing agent of the Edison Company, testified that there had been a variation in the price of this character of coal in April and May of 1916 of possibly 5 cents a ton, and within the year probably 10 to 15 cents a ton, and that in July, 1916 (when these contracts were written), and prior to that time, the price was constantly rising, so that a fixed sum of 20 cents a ton would not seem to be so excessive as to evidence that the parties to this contract had disregarded the principle of compensation in arriving at liquidated damages. But the parties, in reaching an agreement as to damages, had the right to take into consideration, not only the possible fluctuation in price, but also the inconvenience, trouble, and expense to the Edison Company in finding and purchasing other coal, or to the coal company in securing other customers. That was a matter of some importance, and that it entered into the consideration of the parties, at least the Edison Company, fully appears by its contracts shortly thereafter with other coal companies, especially with the Paige-Jellico Company and the Big Creek Coal Company, in both of which contracts it is provided that the damages shall be the difference in the market price plus 15 cents a ton to the Edison Company "to cover the expense of so purchasing such coal."

It also appears from the evidence that the Edison Company was operating a public utility in the city of Detroit, that its coal requirements were very large, and that it was absolutely essential that it should have a large supply of coal on hand at all times, in order that it might be in position to render proper service to the public, and therefore the possible failure of the coal company to make deliveries might easily result in special damages to it. In the construction of this contract, this court must not overlook the fact that the contracting parties were both familiar with the coal business in all its details. The Edison Company bought and consumed large amounts of coal each year; the coal company was engaged in selling coal in equally large quantities. The conditions of the coal trade from year to year were fully known and understood by each of the contracting parties. They may not have fully appreciated the disturbance of the coal market by reason of the World War, for this nation had not yet entered into that conflict. Nevertheless, the premonitions were ominous; the war had already affected the price of some commodities in this country, and these were things to be taken into consideration by these experienced managers of the respective corporations, parties to these contracts, and, while it is true that in the construction of these contracts, we must take the situation as it then existed and as it then appeared to them, and not in the light of later developments, nevertheless, from these facts, and particularly the range of the fluctuation of prices within the preceding year, the then present tendency to a rising market, considered in connection with the delay, annoyance, inconvenience, and expense of finding and purchasing other coal, the practical difficulty of proving specific damages, the nature of plaintiff's business, and the absolute necessity of its maintaining an ample supply of fuel at all times, it does not appear that the amount stipulated in this contract as liquidated damages is so extravagant or

disproportionate to the amount of possible property loss, as to show that "compensation was not the object aimed at, or as to imply fraud, mistake, circumvention, or oppression." Therefore no reason appears from the evidence in this case why this court should set aside and hold for naught a solemn contract, entered into between men of affairs, largely experienced and fully advised as to conditions and incidents of the business to which the contract relates and substitute its own judgment for the judgment of the contracting parties. Wise v. U. S., supra; Sun Printing Ass'n v. Moore, supra; U. S. v. Steel Co., supra; Sorenson v. U. S., 51 Court of Claims, 69–80; Bagley v. Peddie, 16 N. Y. 469, 69 Am. Dec. 713; Diestal v. Steveson, 2 K. B. 345; Davis v. Cement Co., 142 Fed. 74, 73 C. C. A. 388.

The conclusion reached by this court as to the validity of the provision in each of these contracts for stipulated damages is based entirely upon the assumption that in this case the plaintiff's damages may be measured by a pecuniary standard, but that, notwithstanding that fact, the amount named by the parties as liquidated damages is not so excessive or disproportionate to the probable property loss as to indicate that in fixing this amount the principle of compensation was disregarded. Yet, even though the rule as to the measure of damages in cases of this character is fixed and certain, nevertheless it fully appears by the record in this case, and particularly the conflicting claims of the respective parties, that the application of that rule is not so easily accomplished in this particular class of cases where the great bulk of the business, at least 65 per cent. of the output of the mines, is usually controlled by contracts, which vary not only in price as to contract coal, but differ materially from the market price of spot coal. Laundry Co. v. Carney, 88 Wash. 327, 153 Pac. 5. It further appears that these contracts provide for the purchase and sale of a very large quantity of coal, and if, as contended on the part of the Edison Company, the contract on the part of the coal company to deliver is absolute and unconditional, regardless of car shortage, embargoes, or any other hindrance to deliveries beyond the control of the coal company, it would seem only fair, reasonable, and right that the coal company should insist that a limitation of its liability for failure to deliver should be written into this contract.

Consideration should also be given to the fact that the coal company, against whom this recovery for damages is sought, is not contending that the provisions in this contract as to liquidated damages is void, because the amount is so large that it amounts to a penalty and not compensation. On the contrary, it is the Edison Company that is making this contention, and is making it in view of the uncontradicted evidence that by reason of later developments this provision is wholly inadequate to cover compensation for actual loss. While it is perhaps true that, if this contract is invalid, the courts will wholly disregard it and award actual damages (Noble v. Sturm, 210 Mich. 462, 178 N. W. 99), yet a court will not disregard the express provisions of a contract in reference to liquidated damages upon the theory that the amount named is too small, but rather only for the reason that the amount named is so

extravagant and excessive as to indicate that it was intended as a penalty, and not compensation, or that the amount was so excessive as to imply fraud, mistake, circumvention, or oppression.

Naturally the plaintiff does not attack this agreement as to liquidated damages, because the amount named is so excessive as to imply fraud, mistake, circumvention, or oppression; but it does ask the court to disregard this provision in the contracts it prepared on its own printed blanks, and in which it inserted, or caused to be inserted, the amount stipulated as liquidated damages, and as so prepared presented the same to the other contracting parties for its acceptance and signature, for the reason, as it now contends, the sum agreed upon as liquidated damages is so excessive as to amount to a penalty and not compensation. The presumption obtains that the plaintiff acted in good faith when it insisted upon this provision being written into the contract for its own protection; that it arrived at the amount it deemed ought to be paid as damages for breach of this contract from the then situation of the coal trade and its past large experience as a purchaser of coal. Certainly the conditions that had developed since these contracts were written could have no tendency to induce plaintiff to believe that it had, at the time the contracts were written, demanded such an extravagant sum that it should now be construed as a contract for penalty and not for compensation. The underlying principle upon which courts grant relief from contracts of this character is based upon the theory that the party seeking to recover the damages stipulated in the contract drove a harsh and unconscionable bargain with the other contracting party, and for that reason courts of equity first, and later courts of law, refused to lend aid in the enforcement of such harsh provisions, where it was apparent, from the sum mentioned and the subject-matter of the contract, that the contract was for penalty and not for compensation.

In this case the plaintiff is now asking to have this contract set aside, because this provision in its interest and for its protection names a sum as liquidated damages so extravagant and excessive that it amounts to a penalty, and at the same time is asking for damages largely in excess of the amount it agreed to accept in full satisfaction of any loss or damage it might suffer by reason of a breach of this contract by the coal company. Under such circumstances a court will be slow to accept the present opinion of a plaintiff that may be influenced by the hope of a larger recovery, as against its former opinion, deliberately reached and solemnly written into the contracts, and, at its instance and request, set aside this contract because it provided for extravagant and excessive damages and awarded it damages in a much larger sum. The position is necessarily an inconsistent one. Nevertheless, if the contract was void when written, it could not operate to the advantage or disadvantage of either party thereto.

[2] Both of these contracts provide that, if less than the scheduled tonnage of coal were mined from the mines named during any month or months, and all of the coal so mined was shipped to the Edison Company, then no damages should be charged to the coal company. The

coal company offered as a defense to this action the failure of the mines in question to mine and furnish the kind of coal specified in these contracts. From the evidence it appears that much more 6″ run of mine coal was mined from the Harlan mines than the total tonnage named in the first contract. It further appears that sufficient run of mine coal was mined at the Harvey and Varilla mines, named in the second contract, to produce enough 2″ nut and slack to fill this contract, if the same had been screened, but that the owners and operators of these mines refused to screen the same because of a car shortage; that in order to screen coal it is necessary to have a number of cars under the tipple at one time, this number depending entirely upon the different sizes that are desired; that if more than one car is used, and they are but partly filled at quitting time, these cars are charged to that mine on its next day allotment of cars; that is to say, if 3 cars were under the tipple and partly loaded at quitting time on one day, and the mine was entitled to an allotment of 10 cars for the next day, these 3 cars would be deducted from that number, and only 7 cars would be furnished to it. Upon this question the trial court charged that when coal was brought up out of the mines, put over the tipple and into the cars, even though it was not screened, that it was mined.

There is, of course, no question but that the coal that was "put over the tipple and into the cars" was mined as run of mine coal; but the question here is whether 2″ nut and slack was mined when it was not screened and put into a separate car, so that it could be marketed as such. It is clear from these contracts and the evidence in this case that there is a distinct and substantial difference recognized in the trade between run of mine coal and 2″ nut and slack; that run of mine coal, although it contains 2″ nut and slack, does not come within the designation of nut and slack, but that it is only when this nut and slack is separated from the run of mine coal and deposited in separate cars that it answers to that description. It would seem that the screening of this coal and separating it into the different sizes known to the trade is a part of the mining operations, yet if this coal company had been the owner and operator of this mine, and had authority to control the screening of the same, it could not be heard to say in its own defense that, because it did not screen the coal and separate the 2″ nut and slack from the run of mine, that therefore the 2″ nut and slack had not been mined. But this defendant coal company was not the owner of or in control of the mining operations at the Harvey and Varilla mines. It had no authority whatever to dictate to the owners and operators of these mines what coal they should screen and what coal they should not screen. Therefore the question of whether sufficient nut and slack was mined from the Harvey and Varilla mines to fill this second contract was a question of fact to be determined by the jury, and ought to have been submitted to it under proper instruction, if there was any conflict whatever in the evidence, either as to how much was actually produced or as to what constituted mining of nut and slack within the contemplation of this contract. The failure of the court to do this was prejudicial error.

[3] It is insisted upon the part of the plaintiff in error that, after the breach of the contract by it, it entered into an agreement of accord and satisfaction with the plaintiff by the terms of which it was to secure from the Paige-Jellico mines a contract for the plaintiff for a large quantity of coal at much less than the market price. It appears from the evidence that the defendant coal company was not the owner of the Paige-Jellico mines, but that some of defendant's stockholders were so largely interested in the Paige-Jellico Company that it was able to influence the conduct of its business, and that the defendant, through Mr. Jewett, its president, offered to Mr. Brennan, purchasing agent of the plaintiff, a contract with the Paige-Jellico Company for a large amount of coal at much less than the then market price. Mr. Jewett testifies in reference to this as follows:

"I went up and saw Mr. Brennan about the contract with the Paige coal. That would, I imagine, mine about 50,000 to 60,000 tons a year. I told him I had appreciated that we had fallen down on the contract for the delivery of coal, which we could not help. I told him by purchasing this coal he could make up any losses that he was in for on this present contract, and I not only told Mr. Brennan that once, but I told him three or four times, and the contract was decidedly under the market price at that time."

In answer to the question why he was offering this contract under the market price, Mr. Jewett answered:

"Why, to make up the shortage on our present contract."

Mr. Jewett further testified that he had two or three conversations with Mr. Brennan covering a period of two or three weeks, and urged him to sign this contract, and that eventually the contract came back signed by Mr. Brennan, as purchasing agent for the Detroit Edison Company. The court, however, excluded this evidence, and charged the jury in reference thereto as follows:

"I charge you as a matter of law that under the undisputed proof in this case the so-called Paige-Jellico contract was not a settlement of this contract. The language used in connection with that, in entering into that contract by the plaintiff with another corporation, although it was closely related to this defendant, that the language used there, and what occurred, does not amount to a settlement of these differences."

This charge, in view of the testimony of Mr. Jewett, to which attention has just been called, was clearly erroneous and prejudicial to plaintiff in error. If the jury believed this testimony of Mr. Jewett that he tendered this contract for the Paige-Jellico coal to Mr. Brennan at less than the market price, upon the condition stated, and that although Mr. Brennan did not then accept his proposition, but later signed and returned this contract and received the benefits thereof, it might very properly reach the conclusion that the contract was signed and accepted and the benefits received by the Edison Company under the terms and conditions proposed by Mr. Jewett. Even if the jury had not found that the Paige-Jellico contract was accepted by the plaintiff as a full accord and satisfaction of the damages it sustained by reason of the failure of the defendant to deliver coal under its con-

tract, nevertheless it might have found from this evidence, that whatever benefits inured to the plaintiff company under the Paige-Jellico contract should be considered in mitigation of damages, and at least a defense pro tanto.

[4] It is also insisted upon the part of the plaintiff in error that the court erred in excluding evidence of a custom in the coal business, well known to the parties to this contract,.. when a shortage of cars occurs, to prorate the available cars in the shipments made upon existing contracts. A custom, to control the construction of a written contract, must be reasonable, and not contrary to law or public policy, or opposed to any express terms of the contract, and must be so general as to justify the presumption that the parties contracted with reference thereto.

Both the contract for the 6″ run of mine coal and the contract for the 2″ nut and slack expressly provide that the amount of coal named therein shall be shipped to the Edison Company, "if during any month or months covered by this contract period there shall have been mined the amount scheduled or more tons of coal at the mines mentioned herein." A custom that would permit the prorating of cars among the various customers of the plaintiff in error would be in direct conflict with this provision of the contract that the Edison Company was to have all of the coal of the character named, mined at these mines, if such total output was necessary to meet the contract requirements, and that,.if less coal were mined during any one month than the amount named in the schedule, then the defendant would not be liable in damages, provided it shipped the entire output to the Edison Company. For this reason, this custom of prorating cars, no matter how well known to the parties, cannot be permitted to vary or alter the express terms of these contracts that are clearly in conflict therewith. The Gazelle and Cargo, 128 U. S. 474–486, 9 Sup. Ct. 139, 32 L. Ed. 496; Jenkins S. S. Co. v. Preston, 186 Fed. 609–612, 108 C. C. A. 473.

The shortage of cars is important only in its effect upon the production of the character of coal named in the contract, at the mines mentioned therein. This contract fully protected the defendant in case sufficient coal was not mined, regardless of the reason for the failure to mine the same.

It is further claimed by the plaintiff in error that the performance was rendered impossible by reason of the embargo placed by the Louisville & Nashville Railroad Company upon all shipments of its cars to points off its own line. It is wholly unnecessary to consider whether the impossibility of performance arising from such a cause would relieve this plaintiff in error from the obligations of its contract, for the reason that it clearly appears from the evidence that this embargo did not render performance impossible. On November 1, 1916, the coal company wrote the Edison Company a letter in reference to the danger of the railroad company declaring such an embargo. The following paragraph is a part of that letter:

"I think that we had better do all we can now to get cars from other lines here that we can send to designated mines, and have them loaded promptly for your contract. I hope you will do everything you can along this line to see if equipment cannot be gotten."

It is true that the coal company also wired the Edison Company on March 17, 1917, that the Louisville & Nashville Railroad Company had placed an embargo against all shipments to points off their own line, and in this telegram made the further statement:

"Which means it will be impossible for us to ship any more coal to you until this restriction has been lifted."

Nevertheless, from the statement in its letter of November 1, 1916, the plaintiff in error cannot now be heard to say that it was not possible to procure cars from other lines, or that it was not fully advised of such possibility. Therefore the evidence in this record presents no question of impossibility of performance.

In view of this court's construction of the provisions in these contracts as to liquidated damages, the charge of the court in reference to the duty of the plaintiff to mitigate its damages becomes wholly unimportant.

For the reasons above stated, the judgment of the District Court is reversed, and the cause remanded for further proceedings in accordance with this opinion.

⬅⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes