## PICKANDS, MATHER & CO. v. H. A. & D. W. KUHN & CO.

(Circuit Court of Appeals, Sixth Circuit. November 5, 1925.)

No. 4397.

1. Sales ⚖══85(2)—Contract for sale of coal construed to allow seller to proportioned daily production when below certain tonnage.

Under contract for sale of 15,000 tons of coal per month, or 600 tons daily, providing that shipments would be based on production of 1,100 tons daily, but on shortage of labor, cars, strikes, or accident reduced shipments might be proportioned by seller on basis of tonnage produced as compared to 1,100 tons daily, held that on mine production falling below 1,100 tons, purchaser was entitled to 600/1100 of production only, and not to first 600 tons produced.

2. Customs and usages ⚖══17—Trade custom could not nullify express conditions of contract.

In action for breach of contract for purchase of coal, alleged trade custom that, if industrial plant for any reason beyond its control was required to shut down plant, it would be relieved from receiving and paying for stipulated monthly supply of coal under contract could not defeat plaintiff's right to recovery, where contract expressly fixed rate of delivery each month.

3. Evidence ⚖══459(2)—Party apparently bound as purchaser could not contradict writing by proving itself an agent only.

Where contract for sale of coal on face purported to be made with defendant only, and no reference was made to any other companies as principals, defendant could not contradict the terms of the writing by proving it was acting as agent only for such other companies, although such evidence might be admissible to charge the principal.

4. Principal and agent ⚖══143(3)—Knowledge by plaintiff that coal sold under contract was to be furnished other companies did not make them parties to contract.

Where contract for sale of coal purported on face to be made with defendant only, and no reference was made to any other companies as principals, fact that plaintiff seller had knowledge that the coal was to be furnished other companies did not thrust them on plaintiff as parties to the contract, since it was not dealing, and never consented to deal, with them.

5. Sales ⚖══384(1) — Rule of damages for breach of contract to purchase coal stated.

In seller's action for breach of contract by failing to take stipulated monthly shipments during last four months of contract, instruction that measure of damages was difference between contract price and fair market price f. o. b. cars at mine, or that jury should adopt difference between producing cost and contract price, if during any part of period it appeared that cost of producing coal was in excess of fair market sale price at the mine, held fair to defendant.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action by H. A. & D. W. Kuhn & Co. against Pickands, Mather & Co. Judgment for plaintiff, and defendant brings error. Affirmed.

Horace Andrews, of Cleveland, Ohio, and David B. Day, of Canton, Ohio (Andrews & Belden, of Cleveland, Ohio, and M. B. & H. H. Johnson, of Cleveland, Ohio, on the brief), for plaintiff in error.

Geo. H. Eichelberger, of Cleveland, Ohio, and Rufus S. Marriner, of Washington, Pa. (Howard F. Burns, of Cleveland, Ohio, on the brief), for defendant in error.

Before DONAHUE and MOORMAN, Circuit Judges, and SESSIONS, District Judge.

MOORMAN, Circuit Judge. This is a suit by H. A. & D. W. Kuhn & Co. to recover damages from Pickands, Mather & Co. for the breach of a contract entered into March 30, 1920, by which the latter company agreed to purchase from the former 180,-000 tons of coal, to be delivered during the year beginning April 1, 1920, and ending March 31, 1921, in equal monthly installments of 15,000 tons, the contract price to be $4.25 a ton f. o. b. cars at the seller's mine, subject to advances to meet increased production cost. The breach was alleged to have resulted from the refusal of defendant to accept the stipulated monthly deliveries for December, 1920, and January, February, and March, 1921.

Upon the hypothesis that it was acting as agent for the United Alloy Steel Corporation and the United Furnace Company in making the contract, defendant set up as a defense the existence of a general custom in the locality of plaintiff's mine, which it alleged relieved it of liability for refusing to take the coal. It also asserted a counterclaim, alleging that plaintiff failed for the first seven months to furnish the tonnage required by the contract. The trial court held that defendant was acting for itself in entering into the contract, and also ruled that the custom relied on was not a valid defense to plaintiff's claim. There was a judgment in damages for plaintiff. The errors assigned and argued, except those relating to the questions pertaining to a priority order of the Interstate Commerce Commission and the measure of plaintiff's damages as set forth in the charge, relate primarily to the trial court's construction of the contract.

[1] On the basic production of 1,100 tons of coal or more a day defendant was entitled under the contract to 15,000 tons a month, or, as both parties seemed to agree, 600 tons a day. This latter quantity is ascertained by dividing the number of days constituting a working month—i. e., 25—into the agreed monthly tonnage. Defendant contends, however, that plaintiff had no right to apply any part of its production to spot sales until it had first supplied defendant's quota of 600 tons for the day. It is on this construction that its counterclaim was based. The provision upon which it relies and about which the controversy hinges is:

"Our said Wilson mine is equipped now to produce fifteen hundred (1,500) tons of coal a day; it has a car rating of thirteen hundred fifty (1,350) tons a day. Shipments will be made, under this contract, based on production of eleven hundred (1,100) tons run of mine coal per day. Should there be a shortage of labor, shortage of cars, strikes, or accidents of any kind, over which we have no control, during the life of this contract, reduced shipments may be proportioned by the seller on the basis of actual production as compared to eleven hundred (1,100) tons per day."

The lower court construed this provision, in the light of the evidence, as requiring the seller to furnish to the buyer approximately 600 tons a day for such time as the daily production was 1,100 tons or more, and when because of shortage of labor or cars or as the result of other unavoidable accident the production fell below 1,100 tons a day, to furnish to the purchaser $^{600}/_{1100}$ or six-elevenths of such daily production, with the right to dispose of the remainder as and when it pleased. In our opinion, that is the correct construction. It is consonant with the purpose of self-protection in the event the production fell below the standard fixed—as to the seller against liability for failure to make full deliveries, and the buyer against discrimination in the deliveries. The parties so construed the contract as to November shipments, and other dealings between them indicate a like construction.

[2] But it is contended under that construction that it was competent to prove the existence of a custom to the effect that where the coal was purchased by an industrial plant, and for any reason beyond its control the plant was required to close, for such time as it was closed the purchaser would be relieved from receiving and paying for the stipulated monthly supply. This upon the

theory that the Alloy Corporation and the Furnace Company were the real purchasers and their plants were closed for the last four months of the contract. If it be true that defendant was acting as agent for those companies and there was in existence such a custom as alleged, it nevertheless could not be introduced in evidence to contradict the terms of the contract. It has been frequently held by this court that a trade custom, no matter how well established, cannot be permitted to nullify the express terms of a contract. Lillard v. Kentucky Distilleries & Warehouse Co., 134 F. 168, 67 C. C. A. 74; Jenkins S. S. Co. v. Preston, 186 F. 609, 108 C. C. A. 473; American Guaranty Co. v. American Fidelity Co. (C. C. A.) 260 F. 897; Jewett, Bigelow & Brooks v. Detroit Edison Co. (C. C. A.) 274 F. 30. This is in accord with the decisions of the Supreme Court. Bliven v. New England Screw Co., 23 How. 431, 16 L. Ed. 510; Federal Reserve Bank v. Malloy, 264 U. S. 160; Barnard v. Kellogg, 10 Wall. 383, 19 L. Ed. 987. In the last-mentioned case it was said, if a custom "be inconsistent with the contract, or expressly or by necessary implication contradicts it, it cannot be received in evidence to affect it." And, quoting Lord Lyndhurst, it "may be admissible to explain what is doubtful; it is never admissible to contradict what is plain." The parties here agreed on a scale of delivery, which manifestly cannot be overturned by a custom inconsistent with its terms.

[3, 4] Nor do we think that the contract was made by defendant as agent for the Alloy and Furnace Companies. On its face it purports to be made with the defendant alone. No reference is made in it to the two companies which defendant alleges it was representing. Knowledge on the part of plaintiff that the coal was to be furnished to those companies did not make them parties to the contract. Such knowledge did not thrust upon plaintiff a party with whom it was not dealing and had never consented to deal. The contract, by its terms, bound the defendant and no one else as purchaser. An agent who binds himself will not, as stated in Ford v. Williams, 21 How. 287, 16 L. Ed. 36, "be allowed to contradict the writing by proving that he was contracting only as agent," although such evidence is admissible "to charge the principal." However, defendant was permitted to show, if it could, that it acted for the two companies in making the contract. It failed to introduce any substantial evidence in support of that view.

Upon the showing that defendant's quota of production was shipped to it during April, May, June, and July, the court withdrew from the jury consideration of the claim of a breach of the contract by plaintiff for those months, but submitted the claim of failure to deliver the agreed quota for shipment to Canton during the three succeeding months. As to that part of the claim, plaintiff relied as a defense on a priority order issued by the Interstate Commerce Commission in the latter part of July, 1920, placing a restriction on shipments of coal to places other than lake ports. The defendant claimed that plaintiff used the order as a pretext for refusing to make deliveries for shipment to the Alloy and Furnace Companies, which companies, because of failure to receive coal, suffered great damage in the operation of their plants. We have already determined that neither of those companies was a party to the contract and defendant could not recover for losses sustained by either of them. Hence the court properly excluded from the consideration of the jury any question of damages sustained by them. Order No. 10 was valid and enforceable. The court correctly interpreted its meaning and effect in the charge and rightly submitted to the jury the issue of fact as to whether plaintiff wrongfully diverted cars to lake points which defendant was entitled to have delivered to it at the mine, free from the lake priority shipment order.

[5] The charge likewise correctly stated the measure of damages if the jury found that defendant had failed to take the stipulated number of cars for the last four months of the contract. It was stated to be the difference between the contract price and the fair market value f. o. b. cars at mine, except if, during any part of that period, it appeared that the cost of producing coal was in excess of the fair market sale price at the mine, the jury would adopt the difference between the producing cost and the contract price as the measure of damages. This was certainly fair to defendant. Without discussing the claim that defendant was entitled to damages because of the failure of plaintiff to deliver six-elevenths of its production during the month of September, it is sufficient to say that the court found, and we think justly, that the excess deliveries in the preceding month and in the first few days of the month of October were, under all the circumstances, applicable to, the month of September.

The judgment is affirmed.